Filed 4/29/13  P. v. Cobb CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EUGENE COBB,<br><br>    Defendant and Appellant. | D061412<br><br><br><br>(Super. Ct. No. SCD229108) |

APPEAL from a judgment of the Superior Court of San Diego County, Kerry Wells, Judge.  Affirmed.

A jury found Eugene Cobb guilty of five counts of grand theft and found true an allegation that the aggregate losses to the victims exceeded $200,000.  He appeals, contending (1) the trial court failed to sua sponte instruct the jury that evidence of his intent to restore the property and subsequent return of the property was relevant to negate larcenous intent, (2) the trial court erred by excluding evidence of his lack of fraudulent intent and thereby prevented him from presenting a full defense, and (3) the trial court

erred by ruling that if he testified, the prosecution could impeach him with a prior conviction for mail fraud. We reject Cobb's contentions and affirm the judgment.

FACTUAL BACKGROUND

Cobb was a part owner of Motorcars Direct San Diego (Motorcars Direct), a high-end car dealership. In 2008, Michele Ramos handled the accounting for the business. (All further date references are to the year 2008.) Motorcars Direct was experiencing problems with its cash flow and having trouble paying its bills and paying off liens on vehicles purchased by consumers. Ramos decided which bills to pay, wrote the checks and gave them to Cobb to sign. However, she discussed the company's cash flow problems with Cobb.

That same year, Motorcars Direct began losing its flooring lines of credit, which it used to purchase inventory for the dealership. As a result, Cobb decided to engage in consignment sales. The consignment sales allowed Motorcars Direct to keep its inventory up without bank credit. Cobb entered into five transactions that were the subject of his convictions in this case:

Count 1

In February, Ralph Frengel entered into a consignment contract with Cobb to sell Frengel's Porsche, which had a lien on it. In the consignment contract, Frengel agreed to pay Motorcars Direct a flat rate of $3,000 to sell his car. If the car sold, Motorcars Direct was required to distribute the proceeds of the sale within 20 days. Motorcars Direct sold the car to Mark Cappos in April for approximately $76,485, but did not notify Frengel of the sale. Accordingly, Frengel continued to make loan payments on the car. In July,

2

Motorcars Direct paid the lien holder approximately $32,685. Frengel never received any money from the sale.

Cappos did not receive title to the car until six to eight months after he took possession of it. As a result of the delay, Motorcars Direct paid for a year of DMV fees for Cappos.

Count 2

In March, Samuel Evans entered into a consignment contract with Motorcars Direct to sell his Porsche. According to the agreement, Motorcars Direct would receive a flat fee commission of $3,000 if it sold the car. The car sold in July for $49,500. Evans did not receive any proceeds from the sale.

Count 3

In June, Dan Thompson entered into a consignment deal with Motorcars Direct to sell his Audi, which had a lien on it. In August, Cobb sold the Audi to Todd Harmon for $60,000. Cobb never paid off the lien holder or Thompson. Motorcars Direct offered to and did make a loan payment for Thompson because the car was sold and the lien holder was not paid off. Thompson eventually got the car back through the lien holder.

Count 4

In June, Charles Scicli consigned his Lamborghini with Cobb. The Lamborghini had a lien on it in the amount of approximately $113,480. In July, Cobb sold the car to Bob Rau for $129,999. Cobb never paid Scicli or the lien holder in full and never delivered title to Rau. Motorcars Direct made three payments on Scicli's loan because it

3

wanted to protect Scicli's credit. Scicli, Rau and the lien holder eventually entered into a settlement and Rau obtained title to the car.

Count 5

In August, Cobb sold his personal Ferrari to Jorge Chavez for approximately $109,365. Chavez took possession of the car, but never received title. When Chavez inquired about the title, Cobb responded by stating that he was filing for bankruptcy and Chavez should deal with Cobb's lawyer. Cobb also stated that he could not return Chavez's money because he used it to "pay some expenses."

Defense Evidence

Cobb contacted Mark Lyon, a financial services provider, to get flooring lines of credit for Motorcars Direct. Lyon tried to obtain credit from Wachovia and informed Cobb that they were getting "warmer and warmer" in securing it. Lyon explained that they were ultimately unsuccessful in their attempts to get credit because almost overnight, the industry stopped giving business credit. Lyon continued his efforts to get credit for Motorcars Direct, but by the end of 2008, the economy prevented it.

A forensic accountant who reviewed Motorcars Direct's business records testified that in August, Cobb put approximately $280,000 into the business. According to the accountant, the dealership attempted to improve its financial position by paying down existing lines of credit and reducing expenses. Motorcars Direct's assets dropped from $1.3 million in January to $164,000 in October. Cobb lost over $750,000 when Motorcars Direct failed.

4

A realtor testified that in 2008, Cobb attempted to sell his condominium in San Diego. According to the realtor, "it was common knowledge the real estate market, starting in about 2007, was all downhill or depreciation. [He thought] it was about average of 60 percent depreciation of real estate in San Diego County." Cobb initially listed the condominium for $1.5 million and then reduced the asking price to $1.3 million, which the realtor considered to be an optimistic expectation. Cobb eventually sold the property through a short sale for approximately $800,000.

## DISCUSSION

### I. *Alleged Instructional Error*

Cobb argues the trial court had a sua sponte duty to instruct the jury that evidence of his intent to restore the property and subsequent return of the property was relevant to the extent that it showed his intent at the time of the conversion was not fraudulent. Specifically, he contends evidence that he made monthly car payments on the vehicles, paid lien holders, and paid DMV fees was inconsistent with fraudulent intent and, without a relevant instruction, the jury was permitted to disregard the evidence. We reject Cobb's argument.

The court "must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial." (*People v. Ervin* (2000) 22 Cal.4th 48, 90.) "The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case. [Citations.] As to pertinent matters falling outside the definition of a 'general

5

principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.'" (*People v. Estrada* (1995) 11 Cal.4th 568, 574.)

Further, the obligation to instruct on defenses arises "'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Barton* (1995) 12 Cal.4th 186, 195.) There is no sua sponte duty to instruct on a defense if the evidence of that defense is minimal or insubstantial. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145; *People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.)

Here, the trial court properly instructed the jury with CALCRIM No. 1806 regarding theft by embezzlement on all five counts. That instruction informed the jury that temporary deprivation of property is sufficient to prove embezzlement and that the "[i]ntent to restore the property to its owner [was] not a defense" to the crime. Additionally, the court instructed the jury with CALCRIM No. 1862, which provided the following: "If you conclude that the People have proved that the defendant committed Grand Theft, the return or offer to return some of the property wrongfully obtained is not a defense to that charge." These instructions are consistent with the law. (*People v. Pond* (1955) 44 Cal.2d 665, 674 ["Restoration of property feloniously taken or appropriated is no defense to a charge of theft."].)

In our view, the trial court properly instructed on the general principles of law concerning theft by embezzlement. There is nothing in the record indicating that Cobb objected to CALCRIM Nos. 1806 and 1862 or that he requested any modifications to

6

these instructions. When the instructions given are correct and adequate, the court has no sua sponte duty to provide amplification or explanation. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778.)

However, Cobb contends the trial court was required to instruct on restoration or return of property because his defense was that he did not have a fraudulent intent at the time of conversion. To make this argument, he relies on *People v. Marsh* (1962) 58 Cal.2d 732 (*Marsh*) and *People v. Edwards* (1992) 8 Cal.App.4th 1092 (*Edwards*). His reliance on these cases is misplaced. In *Marsh*, the court held the trial court erred in excluding evidence negating the specific intent element for theft by false pretenses. (*Marsh*, *supra,* 58 Cal.2d at p. 741.) In *Edwards*, the court held that while restoration of property is not a defense to theft, a defendant is permitted to present evidence to show that his intent at the time of taking was not larcenous. (*Edwards*, *supra*, 8 Cal.App.4th at pp. 1100–1101.) Neither of these cases discussed whether the trial court has a sua sponte duty to instruct the jury that efforts to restore or return property taken are relevant to whether defendant had a wrongful intent at the time of taking.

Even if the court had a sua sponte duty to instruct the jury that intent to restore the property or subsequent return of the property was relevant to show nonlarcenous intent, the evidence was not sufficient to justify the instruction. Cobb points to evidence that on count 1, Motorcars Direct paid the lien holder approximately $32,685 and paid a year of DMV fees for the buyer; and on counts 3 and 4, Motorcars Direct made loan payments on behalf of the consignor. Notably, there is no evidence that Cobb made any efforts to help the victims in counts 2 and 5, and in count 5, he admitted that he could not return the

7

victim's money because he used it to pay his expenses. In our view, the evidence was minimal and was not sufficient to warrant an instruction that Cobb's intent to restore the property and subsequent return of the property was relevant to show his intent at the time of the conversion was not fraudulent.

Lastly, in his reply brief, Cobb contends for the first time his counsel provided ineffective assistance by failing to request a clarifying instruction. Cobb's assertion is waived because he did not raise it in his opening brief. (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2.)

## II. *Alleged Evidentiary Error*

### A. Background

At trial, Cobb requested to present testimony from a forensic accountant regarding the downturn in the economy in 2008 and the impact of the housing market on his efforts to sell his home and equity in the home. Cobb argued the evidence was relevant to whether he had a fraudulent intent to deprive the victims of property. The trial court found that evidence regarding the economy was well known and cumulative of other testimony. In regard to evidence concerning the housing market, the trial court found it was not relevant and was well known.

### B. Analysis

Cobb argues the trial court erred by excluding evidence of his lack of fraudulent intent and thereby prevented him from presenting a full defense. Specifically, he contends the trial court erred in excluding testimony regarding the economic downturn in

8

2008 and the impact of the housing market on his attempts to sell his condominium. We reject Cobb's contentions.

A trial court has broad discretion to determine the relevance of evidence and to exclude evidence it deems irrelevant, confusing, cumulative, or unduly prejudicial. (*People v. Weaver* (2001) 26 Cal.4th 876, 933.) We review the trial court's determination on admissibility of evidence for an abuse of discretion, examining the evidence in the light most favorable to the court's ruling, and will reverse only if the trial " ' "court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citations.]" (*People v. Ochoa* (2001) 26 Cal.4th 398, 437–438.) Application of the ordinary rules of evidence does not impair a defendant's right to present a defense (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428) and we review the erroneous exclusion of evidence to determine whether it was reasonably probable a result more favorable to the defendant would have been reached in the absence of the error (*id*. at p. 429; *People v. Watson* (1956) 46 Cal.2d 818, 836).

Here, we cannot conclude that the trial court abused its discretion by excluding evidence of the economic downturn in 2008 and housing market. The proposed evidence was cumulative of other evidence. Specifically, an investment banker called by the prosecution testified that Motorcars Direct hired him to help obtain financing for the dealership. His efforts failed, however, because the economy "tanked" in 2008 and "the whole country came down to a standstill." The witness explained that "2008 was a big crash" and it was difficult to obtain financing during that time. Additionally, Cobb's realtor testified that beginning in 2007, there was a significant decline in the housing

9

market.  Although Cobb listed his condominium for more than $1 million, that was not a realistic expectation and Cobb eventually sold the home through a short sale for approximately $800,000.  Thus, the jury heard evidence regarding the downturn in the economy and housing market.  Evidence from a forensic accountant on the same topics would have been cumulative.

Further, general evidence of the economic downturn and housing crisis in 2008 was not relevant to whether Cobb's intent was fraudulent.  As the trial court noted, while Cobb's attempt to sell his condominium and "to do whatever he could" may have been relevant to his intent, general evidence of the housing market was not.  The same is true regarding the economy.  Along these lines, in addition to the evidence we have already discussed, the trial court permitted evidence that the economy in 2008 prevented Cobb from obtaining credit for the dealership; in less than a year, the assets of the dealership dropped over $1 million; Cobb put a significant amount of money into the business; and Cobb originally listed his condominium for a price that may have resulted in a profit but eventually sold it through a short sale.  Under these circumstances, we conclude the trial court acted well within its discretion and did not prevent Cobb from presenting a full defense because the evidence he sought to present was cumulative and irrelevant.

III.  *Impeachment with Prior Conviction*

Prior to trial, the court granted the prosecutor's request to impeach Cobb with a 20-year-old conviction for mail fraud if he testified at trial.  Cobb did not testify.  He now argues the trial court erred in ruling the prosecution could impeach him with his prior conviction and the ruling prevented him from testifying.  We disagree.

10

A defendant must testify at trial to preserve a claim that the court erred in ruling on an in limine motion to impeach the defendant with a prior conviction.  (*People v. Collins* (1986) 42 Cal.3d 378, 383–388 (*Collins*); *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1174 (*Rodrigues*).)  As our Supreme Court explained, there are three reasons for this rule:  "First, without the precise factual context that such testimony would have provided, the appellate court cannot review the balance required to be drawn between the probative value and prejudicial effect of the prior conviction.  [Citation.]  Second, the trial court's *in limine* ruling is necessarily tentative because the court retains discretion to make a different ruling as the evidence unfolds.  Also, when the defendant does not testify, there is no way to know whether the prosecutor ultimately would have used the prior conviction to impeach: if the prosecution's case is strong and the defendant is impeachable by other means, the prosecutor might elect not to use a questionable prior conviction.  Thus, any possible harm stemming from the *in limine* ruling is '"wholly speculative."'  [Citation.]  Third, 'when the trial court errs in ruling the conviction admissible the reviewing court cannot intelligently weigh the prejudicial effect of that error if the defendant did not testify.'  [Citation.]  If such rulings were reviewable on appeal, '"almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying."'  [Citations.]"  (*Rodrigues*, *supra*, 8 Cal.4th at pp. 1174–1175.)

Here, Cobb did not testify at trial.  On appeal, he does not provide a persuasive reason as to why the *Collins* rule is not applicable to him.  Cobb merely asserts that his case is distinguishable from *Collins* because "a full an[d] complete offer of proof of [his]

11

testimony was presented, and it wasn't just presented at the beginning of the case, but throughout the case, specifically when the defense sought to present evidence of supporting forensic accounting evidence." Even if there was an offer of proof regarding Cobb's testimony, that only addresses the first reason for the *Collins* rule by providing the nature of his testimony. (*Collins*, *supra*, 42 Cal.3d at p. 384.) Without Cobb's testimony, we are unable to determine whether the prosecutor would have ultimately used the prior conviction to impeach him or whether the trial court would have changed its ruling as the evidence unfolded. Further, we cannot weigh the prejudicial effect of the court's ruling, if any, because Cobb did not testify. Under these circumstances, we conclude Cobb cannot challenge the trial court's in limine ruling permitting the prosecutor to impeach him with a prior conviction if he testified.

## DISPOSITION

The judgment is affirmed.


McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

12